IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————

RON GOLAN and DORIT GOLAN,

*Plaintiffs-Appellants,*

v.

VERITAS ENTERTAINMENT, LLC, ET AL.

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION
(HONORABLE E. RICHARD WEBBER)

———————————

SUPPLEMENTAL APPENDIX OF APPELLEES FREEEATS.COM, INC. AND
AIC COMMUNICATIONS, LLC

———————————

Teresa Young
Brown & James, P.C.
800 Market Street, Suite 1100
St. Louis, MO 63101
(314) 242-5315

*Attorneys for Appellees-Defendants*
*FreeEats.Com, Inc. and AIC Communications, LLC,*
*collectively "ccAdvertising"*

**Appellees-Defendants AIC Communications, LLC and FreeEats.com, Inc.'s Supplemental Appendix**

| Docket # | Description | Appendix # |
|---|---|---|
| 299-2 | Excerpts of Deposition Transcript of Dorit Golan | SDA001-005 |
| 299-1 | Excerpts of Deposition Transcript of Ron Golan | SDA006-009 |
| 453 | Excerpts of Plaintiffs' Closing Argument on Seventh Day of Trial | SDA010-013 |

# Case: James Armbruster, et al v. Veritas Entertainment, LLC

Transcript of Dorit Golan

**Date:** August 16, 2013

*This transcript is printed on 100% recycled paper*



GorePerry
REPORTING & VIDEO

515 Olive Street, Suite 300
St. Louis, MO  63101
Phone:314-241-6750
1-800-878-6750
Fax:314-241-5070
Email:schedule@goreperry.com
Internet: www.goreperry.com

**5**

1              DORIT GOLAN,
2  having been first duly sworn to testify the truth,
3  the whole truth, and nothing but the truth in the
4  case aforesaid, deposes and says in reply to oral
5  interrogatories, propounded as follows, to-wit:
6              EXAMINATION
7  **QUESTIONS BY MR. ROTHMAN:**
8      Q   Good morning, Ms. Golan.
9          Could you please state your name for the
10 record?
11     A   Dorit Golan.
12     Q   And what's your date of birth?
13     A   October 25th, '58.
14     Q   Are you employed?
15     A   Yeah.
16     Q   Where?
17     A   Amdocs, Inc.
18     Q   What do you do for them?
19     A   HR.
20     Q   What's your title?
21     A   HR information systems specialist.
22     Q   So you understand, having sat through your
23 husband's deposition, that you're here to answer
24 questions today?
25     A   Yeah.

**6**

1      Q   And you're here to do so truthfully?
2      A   Mm-hmm.
3      Q   And if you have any questions for me in
4  terms of rephrasing questions or you need a break,
5  just let me know, okay?
6      A   Okay.
7      Q   What did you do to prepare for your
8  deposition today?
9      A   I went over the recording message again
10 and went over the paperwork that were exchanged
11 between us and our lawyer, and then we had a meeting
12 with our lawyer.  That's it.
13     Q   The meeting yesterday, or was it earlier
14 this week?
15     A   Was it ... on Sunday.
16     Q   On Sunday.  How long was that meeting?
17     A   Half an hour, I believe.
18     Q   And this is the same meeting that your
19 husband testified about?
20     A   Mm-hmm.
21     Q   Did you have any other meetings other than
22 the Sunday meeting and the meeting this morning?
23     A   Not an official one, no.
24     Q   Any phone calls?
25     A   Phone calls just letting us know to

**7**

1  complete the paperwork that we needed.
2      Q   So in terms of preparing for this
3  deposition, did you have any phone calls to prepare
4  for this deposition?
5      A   No.
6      Q   Have you ever been a party in any lawsuit?
7      A   No.
8      Q   Have you ever answered any calls asking
9  survey questions?
10     A   Never.  I don't answer phones when I don't
11 know who it is.
12     Q   Okay.  Fair enough.
13         Is it your understanding that you are a
14 plaintiff, a named plaintiff, in this lawsuit?
15     A   Yeah.
16     Q   And is it your understanding that you are
17 alleging that your residential phone line received
18 two calls in September 2012?
19     A   Mm-hmm.
20     Q   And is it your contention that the number
21 that the calls were made to is (636) 812-2121?
22     A   Correct.
23     Q   And that is your home phone line; is that
24 right?
25     A   Right.

**8**

1      Q   And your husband testified that you have
2  caller ID.  Is that accurate?
3      A   That's correct.
4      Q   The first call, according to your
5  interrogatory responses, was received on
6  September 10th, 2012, at 9:50 a.m.?
7      A   Mm-hmm.
8      Q   And nobody was present at your house at
9  that time; is that correct?
10     A   Mm-hmm.  Correct.
11     Q   Did you ever listen to this call
12 recording?
13     A   Yeah.  When I came back from work.
14     Q   Was your husband present when you listened
15 to it?
16     A   I don't think so, no.  He usually comes
17 from work after me.
18     Q   So on September 10th, 2012, you came home
19 and listened to the recording that --
20     A   Everything that was on, not specifically
21 this, yeah.
22     Q   But including this?
23     A   Yeah.
24     Q   And the recording of the call that you're
25 suing over in this action stated, "Liberty.  This is

SDA002
fda065ee-093f-4ab0-8d70-5e1c73614788

**9**

1   a public survey call.  We may call back later."
2      Is that right?
3   **A**  Right.
4   **Q**  Is that a complete and accurate reflection
5   of what was recorded?
6   **A**  Correct.
7   **Q**  So there wasn't any reference to the movie
8   Last Ounce of Courage?
9   **A**  No.
10   **Q**  And there wasn't any announcement about
11   who was making the call; is that correct?
12   **A**  Correct.
13   **Q**  Did you hear any beeps or tones or other
14   noises on the call recording?
15   **A**  I don't think so.  I don't think so.
16   **Q**  You don't recall hearing any?
17   **A**  No.
18   **Q**  Was anybody present when you listened to
19   the call recording?
20   **A**  I don't think so.  Might be the kids in
21   the other room or something, but ...
22   **Q**  As far as you know, the kids don't know
23   anything about these call recordings; right?
24   **A**  No.
25   **Q**  Now, is it your understanding that you

**10**

1   allege in this lawsuit that the first call recording
2   involved an advertisement for the movie the Last
3   Ounce of Courage?
4   **A**  I didn't know when I listened to the call.
5   I learned about it only later.
6   **Q**  Right.  And you learned about it later
7   how?
8   **A**  From Mr. Eisenberg.
9   **Q**  Did you learn about it from anybody else?
10   **A**  No.
11   **Q**  And what is your understanding about how
12   this call may relate to an advertisement for the
13   movie Last Ounce of Courage?
14   **A**  Can you explain to me again what kind of
15   answer you want from me?
16   **Q**  Well, I --
17   **A**  I mean ...
18   **Q**  Sure.  But --
19   **A**  I mean, what exactly --
20   **MR. EISENBERG:  Answer what you know.**
21   **BY MR. ROTHMAN:**
22   **Q**  I think Ron would like me to rephrase the
23   question, maybe --
24   **A**  Right.
25   **Q**  -- so I'll rephrase it.

**11**

1      Do you have an understanding as to whether
2   or not the first call recording involved an
3   advertisement for the movie Last Ounce of Courage?
4   **A**  No.
5   **Q**  So you personally aren't contending that
6   the movie involved -- strike it.
7      You personally aren't contending that the
8   call involved the movie The Last Ounce of Courage;
9   correct?
10   **A**  I didn't know at the time, but I know now.
11   **Q**  Right.  I guess my question is, are you
12   contending that that call involved the movie Last
13   Ounce of Courage or not?
14   **A**  Yes.
15   **Q**  You are contending that?
16   **A**  I think so, because after I -- after we
17   engage and we got more information about that, I
18   know that this is part of the -- those why those
19   calls were made.  But I didn't know at the time when
20   I listened to it, I just know that it's some kind
21   of, you know, robocall that are leaving messages to
22   people's house, that's it.
23   **Q**  Have you received any other phone calls
24   from this phone number before?
25   **A**  No.  Just those two phone calls in

**12**

1   September.
2   **Q**  Okay.  So going back to your contention in
3   this lawsuit, you are contending that the first call
4   involved an advertisement for the movie The Last
5   Ounce of Courage; correct?
6   **A**  I assume, but I didn't know at the time.
7   **Q**  Yeah, I understand you don't know at the
8   time.  I'm just fast-forwarding to now, today, in
9   your lawsuit that's pending.
10      Are you claiming that that phone call
11   involved the movie The Last Ounce of Courage?
12   **MR. EISENBERG:  Object to the term as**
13   **vague, meaning "involve," whether you're saying**
14   **whether it identified Last Ounce of Courage**
15   **versus had something to do with a call**
16   **campaign.**
17   **BY MR. ROTHMAN:**
18   **Q**  Sitting here today, is it your allegation
19   that the first phone call was an advertisement for
20   the movie Last Ounce of Courage?
21   **A**  I would say yes.
22   **Q**  And what is the basis for your contention
23   that the phone call involves or involved the movie
24   Last Ounce of Courage?
25   **A**  Talking to Mr. Eisenberg and then surfing

3 (Pages 9 to 12)

SDA003
fda065ee-093f-4ab0-8d70-5e1c73614788

**17**

1  with Mr. Eisenberg?
2  **A**   Mm-hmm.
3  **Q**   And that was after he suggested that you
4  join the lawsuit?
5  **A**   Right.
6  **Q**   And with respect to the second recording,
7  you testified in your interrogatory response that
8  that call was received on September 12th, 2012, at
9  11:25 a.m.  Does that sound right?
10  **A**   Mm-hmm.
11  **Q**   Was anybody present at your residence when
12  that call was received?
13  **A**   No.
14  **Q**   Just so the record is clear, that call,
15  according to your husband, was made to (636)
16  812-2121?
17  **A**   Correct.
18  **Q**   And that's your home line; correct?
19  **A**   Correct.
20  **Q**   And nobody was present at your residence
21  on September 12th, 2012, at 11:25 a.m.; correct?
22  **A**   Mm-hmm.  Correct.
23  　　　**MR. EISENBERG:**  Make sure you try to say
24  yes or no.
25

**18**

1  **BY MR. ROTHMAN:**
2  **Q**   According to your interrogatory responses,
3  the content of the call was "Liberty.  This is a
4  public survey call.  We may call back later."
5  　　　Is that right?
6  **A**   Correct.
7  **Q**   Is that a complete recitation of what you
8  heard on the call?
9  **A**   Correct.
10  **Q**   So you didn't hear any reference to any
11  movie on that call recording; correct?
12  **A**   Correct.
13  **Q**   And you didn't hear any reference to Mike
14  Huckabee on that call either?
15  **A**   Correct.
16  **Q**   Did you hear any beeps, tones, or other
17  noises on the call recording?
18  **A**   I don't think so.  I don't remember, but I
19  don't think so.
20  **Q**   Do you know what number the call came
21  from?
22  **A**   I don't remember by heart the number, but
23  it is stated on the paperwork because it's on the
24  the caller ID.
25  **Q**   It's the same as the first call; right?

**19**

1  **A**   Correct.
2  **Q**   How many times did you listen to the
3  second recording?
4  **A**   To the second recording, in total, or on
5  the day that I came back from work?
6  **Q**   In total.
7  **A**   Maybe five times.
8  **Q**   And how many times did you listen to the
9  call recording on the day that you received it?
10  **A**   One time, maybe two.  One time when I came
11  home and then second time with my husband.
12  **Q**   When he played it?
13  **A**   Yeah.  Not when he played it, no.  I asked
14  him if he -- we usually ask if there were -- is
15  there anything specifically on the answering
16  machine, and I said this call that I'm not familiar
17  with, and then we like -- like I would maybe review
18  it with him, but that's it.
19  **Q**   And at the time you received the second
20  recording did you have any intention to sue over it?
21  **A**   No.
22  **Q**   That intention didn't arise until
23  Mr. Eisenberg suggested that you join the lawsuit;
24  correct?
25  **A**   Correct.

**20**

1  **Q**   Do you contend that the second call was
2  part of an advertisement for the movie Last Ounce of
3  Courage?
4  **A**   Yes.
5  **Q**   What's the basis for that contention?
6  **A**   Same thing that the first one is.
7  **Q**   So it's information provided by
8  Mr. Eisenberg?
9  **A**   Mm-hmm.  Yes.  Correct.  And then from my
10  search of the Internet.
11  **Q**   So you conducted one search that you
12  specifically recall for both calls?
13  **A**   Right.  Correct.
14  **Q**   I think you might have said there was a
15  second search earlier this year?
16  **A**   Yeah.  Last week.
17  **Q**   Was that in preparation for the
18  deposition?
19  **A**   Correct.
20  **Q**   Do you recall what -- was that a Google
21  search?
22  **A**   Yeah.
23  **Q**   And did you employ the same methodology
24  that you employed for the first search?
25  **A**   Correct.

SDA004
fda065ee-093f-4ab0-8d70-5e1c73614788

21

1    Q   Do you recall what the search results were
2  on the second search?
3    A   I think the same.  I don't remember.
4    Q   Did you save any of the search results
5  either the first time or the second time?
6    A   No.
7    Q   With respect to the second search, what
8  was the nature of the results?
9    A   The same thing as the first one.
10 Basically, it's the same kind of information.
11   Q   Did you do anything to investigate or
12 verify the accuracy of that information?
13   A   No, I did not.
14   Q   At the time the calls were received, was
15 the phone bill in your name, your husband's name, or
16 both of your names?
17   A   I think both of our name.
18   Q   Your husband testified that you are not
19 charged based on calls that come into your
20 residence.  Is that accurate?
21   A   Correct.
22   Q   At some point you decided to become a
23 plaintiff in this lawsuit?
24   A   Correct.
25   Q   And whose idea was it to file the lawsuit?

22

1    A   Well, it came from Mr. Eisenberg; he asked
2  us about that.  Actually, he asked my husband if --
3  as he said, they were talking.  That's how my
4  husband presented to me, that they were talking
5  about phone calls.  And he asked if we want to be
6  engaged in this lawsuit, and my husband asked me and
7  I said yes.
8    Q   So the way you became involved was
9  Mr. Eisenberg had a conversation with your husband?
10   A   Right.
11   Q   And then your husband had a separate
12 conversation with you?
13   A   Yeah.  And I guess after that, because we
14 are running together, we were discussing it.
15   Q   Oh, I see.  So there was a separate
16 conversation after that where you decided -- the
17 three of you had a discussion about joining the
18 lawsuit?
19   A   We were talking about it, yeah.
20   Q   Do you remember when that conversation
21 was?
22   A   No.  Probably last year sometime.
23   Q   Sometime --
24   A   Because we run all together, so ...
25   Q   Do you have an engagement letter with

23

1  Mr. Eisenberg?
2    A   I believe we have on the document that we
3  signed.
4    Q   With Mr. Eisenberg?
5    A   When we became part of the case there are
6  paperwork that we needed to sign.
7    Q   Are you paying Mr. Eisenberg for his
8  services?
9    A   No.
10   Q   Do you expect to receive any recovery in
11 this lawsuit?
12   A   Yes.
13   Q   What do you expect?
14   A   I don't know.  It's not my decision.  It's
15 the judge decision.
16   Q   What are you asking for?  Do you know?
17   A   Not necessarily, no.  I don't have an
18 amount or something like that in mind.
19   Q   Prior to this case, have you ever
20 considered filing any lawsuits over robocalls?
21   A   No.  Just the fact that my husband was
22 calling to this noncall number, you know, this phone
23 number that when you -- I forgot what's the name of
24 it, but non ...
25   Q   The Do Not Call List?

24

1    A   Yeah.  Yeah.  The noncall list, yeah.
2  Sorry.
3    Q   No problem.
4        Other than that, do you have any intention
5  to sue anybody over any robocalls?
6    A   No.
7    Q   Do you know who Mr. Schultz is?
8    A   Huh?
9    Q   Mr. Schultz.
10   A   Part of the association that Mr. Eisenberg
11 work with, the law firm.
12   Q   Is he also your lawyer in this case?
13   A   No.  Mr. Eisenberg is.
14   Q   What did -- or let me rephrase the
15 question.  Why did you decide to sue over these
16 calls as opposed to other calls that you received,
17 other robocalls?
18   A   Because Mr. Eisenberg was representing
19 this case.
20   Q   Because he approached you and asked you to
21 join it?
22   A   Yeah.  No.  He didn't ask to join, he
23 asked if we would like to join.
24   Q   Fine.  If he -- okay, yeah.
25       Background questions.  Are you registered

6 (Pages 21 to 24)

SDA005
fda065ee-093f-4ab0-8d70-5e1c73614788

# Case: James Armbruster, et al v. Veritas Entertainment, LLC

## Transcript of Ron Golan

**Date:** August 16, 2013

*This transcript is printed on 100% recycled paper*



515 Olive Street, Suite 300
St. Louis, MO  63101
Phone:314-241-6750
1-800-878-6750
Fax:314-241-5070
Email:schedule@goreperry.com
Internet: www.goreperry.com

**13**

1    **Q**  Probably more than two years?

2    **A**  Yes.

3    **Q**  Do you know if the State of Missouri took

4  any action in response?

5    **A**  I do not know.

6    **Q**  Did you take any further action other than

7  complaining to the State of Missouri?

8    **A**  No.

9    **Q**  Do you know who made that call that you

10  complained about?

11    **A**  I don't remember.

12    **Q**  And was it a survey call that you

13  complained about or was it something else?

14    **A**  I do not remember.

15    **Q**  Just so we're clear, the call that you

16  complained to the State of Missouri about, you don't

17  recall, sitting here today, whether or not that was

18  a survey call; is that true?

19    **A**  That's correct.

20    **Q**  Okay.  With respect to calls that you

21  received that did involve surveys, have you ever

22  complained about those calls as opposed to any other

23  calls?

24    **A**  I don't remember.

25    **Q**  Okay.  Just so we're also clear, you

**14**

1  haven't sued over any calls involving survey

2  questions?

3    **A**  Correct.

4    **Q**  In this lawsuit you're claiming that you

5  received two calls?

6    **A**  Correct.

7    **Q**  Let's talk about the first call.  When did

8  the first call -- strike that.

9       When did you receive the first call?

10    **A**  It is in the document that we submitted.

11  The exact dates and times, we -- I listened to the

12  call in the evening after I came back from work on

13  the date of the call.

14    **Q**  Does September 10, 2012, sound about

15  right?

16    **A**  It sounds like about right, yes.

17    **Q**  And that call was made to -- what phone

18  number was that call made to?

19    **A**  (636) 812-2121.

20    **Q**  Is that your home phone line?

21    **A**  Yes.

22    **Q**  Do you have caller ID?

23    **A**  Yes.

24    **Q**  Do you know what phone number the call

25  came from?

**15**

1    **A**  Yes.

2    **Q**  What number is that?

3    **A**  I don't remember.  It's in the papers that

4  you should have.

5    **Q**  The interrogatory responses?

6    **A**  You should have -- it's in one of the

7  documents that I reviewed yesterday that specify the

8  caller ID number and the caller ID name.

9    **MR. EISENBERG:  It's in the petition.**

10  **BY MR. ROTHMAN:**

11    **Q**  Does (202) 769-1087 sound about right?

12    **A**  I think so.

13    **Q**  At some point did you give that phone

14  number to your lawyers?

15    **A**  Yes.

16    **Q**  When did you do that?

17    **A**  I don't remember exact date.

18    **Q**  Well, can you estimate a month or at least

19  a year?

20    **A**  I believe it was beginning of the year, of

21  this year.

22    **Q**  Beginning of 2013?

23    **A**  Yes.

24    **Q**  So the call came in September 2012, and

25  you still -- what did you do to preserve the phone

**16**

1  number that the call came from?

2       Did you write it down or did you keep it

3  on your caller ID, or what did you do?

4    **A**  It's on the answering machine.  The caller

5  ID, it's in the -- since the call was recorded, and

6  it's still safe.

7    **Q**  So is it a digital answering machine?

8    **A**  Yes.

9    **Q**  So when you save messages to that digital

10  answering machine, it also saves the number?

11    **A**  Yes.

12    **Q**  I see.  Okay.

13       And do you know when the call was actually

14  received at your residential line?

15    **A**  It was in the morning.  I don't remember

16  the exact time of day because we were not at home.

17    **Q**  So according to your interrogatory

18  responses, I'll represent to you that you stated

19  that the call was received at, I believe it was,

20  9:50 in the morning on September 10th.

21       Does that sound right?

22    **A**  That sounds right.

23    **Q**  Was anybody present at your residence?

24    **A**  No.

25    **Q**  So you just live with you and your wife?

SDA007
12c04f91-f934-4fba-b1c4-491fec6799a6

| | 21 |
|---|---|

1   advertisement for the movie Last Ounce of Courage?
2       **A**   Can you rephrase the question?
3       **Q**   Sure.  Your lawsuit contends that this
4   call -- or let me rephrase the question.
5           Is it your understanding that the
6   plaintiffs in this case contend that the calls they
7   received were part of an advertisement for the movie
8   Last Ounce of Courage?
9       **A**   I'm not sure I understand what's the
10  question.  Are you asking me if this is --
11      **Q**   I can rephrase the question.
12          What's your understanding about what this
13  lawsuit is about?
14      **A**   I believe this call is part of a campaign
15  to advertise the movie Last Ounce of Courage.
16      **Q**   And what's the basis for that
17  understanding?
18      **A**   The basis is information that I got from
19  Mr. Eisenberg that the phone number is associated
20  with a company that -- and there are other cases or
21  other -- not cases -- other incidents where a call
22  was made from this exact same number, which, if
23  people picked up the phone, they would get different
24  announcements that advertise the movie Last Ounce of
25  Courage.

| | 22 |
|---|---|

1       **Q**   So you received some information from your
2   attorney suggesting that this may be part of a call
3   involving the movie?
4       **A**   Yes.
5       **Q**   You just testified about, using your
6   phrase, "other incidents," I think is what you said.
7           Is the basis for your knowledge about
8   those other incidents also from your attorney?
9       **A**   Yes.
10      **Q**   Do you have any information, other than
11  information that was provided from your attorney,
12  that this call was part of a movie, The Last Ounce
13  of Courage?
14      **A**   No.
15      **Q**   So the only basis you have for testifying
16  that this call may have been part of an
17  advertisement for a movie is information provided by
18  your attorney to you?
19      **A**   Yes.
20      **Q**   So you don't have any firsthand knowledge
21  that this call involved an advertisement for The
22  Last Ounce of Courage?
23      **A**   No.
24      **Q**   No, you don't, or yes --
25      **A**   No.  I said no.

| | 23 |
|---|---|

1       **Q**   You do not have such information; correct?
2   Let me rephrase the question.  It was a poorly
3   phrased question.
4           Do you have any independent knowledge that
5   the call involved the movie Last Ounce of Courage?
6       **A**   No.
7       **Q**   Do you recall -- never mind.
8           Did you tell anybody else, other than
9   potentially your wife or your attorneys, about the
10  call?
11      **A**   No.
12      **Q**   Why did you save the recording?
13      **A**   I don't have any good reason.  I usually
14  do not erase recordings from my machine.
15      **Q**   So it's just a standard practice for you
16  to save messages?
17      **A**   Yes.
18      **Q**   Do you know the names of any other people
19  who received calls similar to the one that you
20  received that you're suing over?
21      **A**   I know of another plaintiff in this case
22  that received the same call.
23      **Q**   Are those the Armbrusters?
24      **A**   Yes.
25      **Q**   Do you know them personally?

| | 24 |
|---|---|

1       **A**   No.
2       **Q**   You just know them through this lawsuit?
3       **A**   Yes.
4       **Q**   Do you know anybody else that received
5   similar calls?
6       **A**   Similar calls?
7       **Q**   Calls like the ones that you're suing
8   over.
9       **A**   Not -- not like the one -- since I didn't
10  talk with anybody on this, I don't know specifically
11  this number or this type of message.  I do not.
12      **Q**   In your interrogatory response you state
13  that you received a second call on September 12th,
14  2012, at 11:25 a.m.  Does that sound right?
15      **A**   Yes.
16      **Q**   And was anybody present at your residence
17  at that time?
18      **A**   No.
19      **Q**   That call was also recorded; correct?
20      **A**   Yes.
21      **Q**   And according to your interrogatory
22  response, the recorded content is, "Liberty.  This
23  is a public survey call.  We may call back later."
24          Do you see that?
25      **A**   Yes.

SDA008
12c04f91-f934-4fba-b1c4-491fec6799a6

## 29

1   **Q** And at some point in time did you engage
2   an attorney to represent you in this lawsuit?
3   **A** Yes.
4   **Q** When did that happen?
5   **A** I don't remember the exact dates.
6   **Q** Do you remember the year?
7   **A** 2013.
8   **Q** So is it your understanding that the
9   complaint in this case was filed --
10  **A** Yeah. It was -- I think the beginning of
11  this year. The recording was in 2012, September;
12  right? I believe it was the beginning of this year
13  when I engaged my attorney.
14  **Q** I'll represent to you that the complaint
15  in this case --
16  **MR. EISENBERG: October 3rd.**
17  **BY MR. ROTHMAN:**
18  **Q** -- was filed on October 3rd, 2012.
19  **Q** So it was probably before that.
20  **Q** So somewhere between September 10th and
21  October 3rd of 2012, does that square with your
22  memory?
23  **A** Probably.
24  **Q** Okay. But you're not the one that decided
25  to retain an attorney?

## 30

1   **A** No. We -- I talked with my lawyer because
2   he's a friend, and we talked about phone calls, and
3   that's how we learned that this is maybe a part of
4   a -- a lawsuit or a class action lawsuit.
5   **Q** So when you say your lawyer, you mean
6   Mr. Eisenberg or do you mean Mr. Schultz?
7   **A** Mr. Eisenberg.
8   **Q** So you know Mr. Eisenberg prior to this
9   lawsuit?
10  **A** Yes.
11  **Q** How?
12  **A** First of all as a friend, because we -- we
13  run together, and, also, he represented us in
14  another case.
15  **Q** Was it one of the two cases you testified
16  about previously?
17  **A** Yes.
18  **Q** That would have been the real estate case?
19  **A** Correct.
20  **Q** Okay. So explain when the conversation
21  took place about the phone calls that you're suing
22  over in this case, the first phone call.
23  When did that -- or the first conversation
24  about the phone calls. When did that happen?
25  **A** I don't remember exactly.

## 31

1   **Q** How did it come up?
2   **A** I don't remember exactly. We were talking
3   about phone calls, advertising phone calls and
4   annoying phone calls that you get.
5   **Q** Were you talking about it in the context
6   of a client of Mr. Eisenberg or as a friend or --
7   **A** We were talking as a friend.
8   **Q** And do you remember where this
9   conversation took place?
10  **A** No.
11  **Q** Was it over the phone?
12  **A** I don't remember.
13  **Q** So you remember some conversation that
14  occurred sometime in September 2012, maybe early
15  October 2012, about phone calls, and how did the
16  Last Ounce of Courage phone calls come into the
17  conversation, if at all?
18  **A** Mr. Eisenberg told me that there is
19  similar calls that were made from the same number
20  advertising the movie Last Ounce of Courage.
21  **Q** And what did you say in response to that?
22  **A** Nothing.
23  **Q** So whose idea was it to file the lawsuit?
24  **A** I think Mr. Eisenberg asked me if we were
25  willing to be part of this lawsuit.

## 32

1   **Q** And you said yes?
2   **A** I said of course.
3   **Q** And did you subsequently enter into an
4   engagement letter with Mr. Eisenberg's law firm?
5   **A** Yes.
6   **Q** And do you know when that occurred?
7   **A** I don't remember. I believe I remember an
8   e-mail or -- from the beginning of this year, but it
9   could have been earlier last year.
10  **Q** Let me rephrase the question.
11  Are you paying Mr. Eisenberg for his
12  services?
13  **A** No.
14  **Q** Is there a fee agreement whereby you
15  receive a certain percentage and he receives a
16  certain percentage of recovery?
17  **A** No.
18  **Q** So he's working for free?
19  **A** I am not sure. I do not know.
20  **Q** Do you have a copy of the engagement
21  letter?
22  **A** Not here. I have a copy at home.
23  **Q** Okay.
24  **A** I don't know that the engagement letter
25  does not mention any sum of money.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

RON GOLAN, ET AL.,          )
                                 )

    Plaintiffs,        )
                                 )

    v.                 )  No. 4:14-CV-00069-ERW
                                      )

VERITAS ENTERTAINMENT, LLC,  )
ET AL.,                  )
                               )

    Defendants.        )

## TRANSCRIPT OF JURY TRIAL

### VOLUME 7

### BEFORE THE HONORABLE E. RICHARD WEBBER
### UNITED STATES DISTRICT JUDGE
### AUGUST 15, 2017

APPEARANCES:

For Plaintiffs:     John G. Simon, Esq.
                     Kevin M. Carnie, Esq.
                     THE SIMON LAW FIRM
                     800 Market Street, Suite 1700
                     St. Louis, MO 63101

                     Brian A. Abramson, Esq.
                     WILLIAMS AND KHERKHER
                     8441 Gulf Freeway, Suite 600
                     Houston, TX 77017

For Defendant
Leininger:         Ari Nicholas Rothman, Esq.
                     Justin Blake Nemeroff, Esq.
                     Brian L. Schwalb, Esq.
                     Danielle E. Sunberg, Esq.
                     VENABLE, LLP
                     600 Massachusetts Ave., NW
                     Washington, DC 20001

                     John W. Moticka, Esq.
                     STINSON AND LEONARD, LLP
                     7700 Forsyth Boulevard, Suite 1100
                     St. Louis, MO 63105

SDA010

## INDEX

Instructions Conference . . . . . . . . . . . . . . . 4

Instruction Nos. 1 through 9 were read  . . . . . . . .33

Closing Argument on Behalf of Plaintiffs  . . . . . .33

Closing Argument on Behalf of Defendant . . . . . . .68

Rebuttal Argument on Behalf of Plaintiffs . . . . . . 113

Reporter's Certificate  . . . . . . . . . . . . . . 122

*   *   *

SDA011

1  ignore everything else.  Everything.  Ignore the e-mails.

2  Ignore the documents.  Just ignore all of it and listen to

3  what we are telling you now.  Even though it is directly

4  contrary to one document after another document after another

5  document after another document.

6         You know, just a couple things.  I'm not going to be

7  long.  You know, we are talking about these agreements and

8  what was said.  Dr. Leininger put in $250,000 way before that

9  agreement was signed, that May 24 agreement.  There was

10 testimony about that.  That was the e-mail where he wanted to

11 know where his 250 went; right?  Saying, I want to know dollar

12 for dollar what you spent it on.

13        We were told that this case is about two calls.

14 This case isn't about two calls.  This case is about

15 3.2 million calls in 15 battleground states to influence the

16 2012 election because that's what Dr. Leininger wanted done.

17 That's what the documents show us.  That's what the testimony

18 shows us in this case.

19        So ladies and gentlemen, you know, the other thing,

20 too.  I told you what this case was going to be about in

21 opening.  I said you are going to have a central issue to

22 decide and that's the issue, whether Dr. Leininger had the

23 right to control the robocall campaign.

24        During counsel's entire, entire close, I don't think

25 I heard him stand up and say, Dr. Leininger did not have the

<u>CERTIFICATE</u>

I, Reagan A. Fiorino, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 121 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 15th day of August, 2017.


*/s/ Reagan A. Fiorino*
Reagan A. Fiorino, CRR, RMR, CCR, CSR
Official Court Reporter